IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA   *
*ex rel.* CORNELIUS HARRIS *et al.*,
    *
    **Plaintiffs**
    *
    v.     CIVIL NO. JKB-09-2457
    *
DIALYSIS CORP. OF AMERICA,
    *
    **Defendant**

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

*I. Background*

This lawsuit by Relators Cornelius Harris and Cindy Boonie asserts Defendant Dialysis Corporation of America ("DCA") violated the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, in relation to DCA's billing of the United States Government for medical claims. (Am. Compl., ECF No. 68.) Filed on March 27, 2009, in the Eastern District of Pennsylvania, the case was transferred in September 2009 to the District of Maryland where it remained under seal pending the Government's decision whether to intervene. (ECF Nos. 1-4.) On February 25, 2013, the Government declined to intervene and, the next day, the original complaint was unsealed. (ECF Nos. 30, 31.) DCA has moved to dismiss the complaint[1] under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 48.) The matter has been thoroughly briefed (ECF Nos. 69, 70), and no hearing is necessary, Local Rule 105.6 (D. Md. 2011). The motion will be granted in part and denied in part.

---

[1] The Court permitted Relators to file an amended complaint, and DCA has briefed its motion taking into account the amendments to the complaint. Any references herein to the "complaint" are meant to refer to the amended complaint.

## II. Standard for Dismissal under Rule 12(b)(1)

The burden of proving subject-matter jurisdiction is on the plaintiff. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) (noting challenge may be either facial, *i.e.*, complaint fails to allege facts upon which subject-matter jurisdiction can be based, or factual, *i.e.*, jurisdictional allegations of complaint are not true). *See also Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (same); *Richmond, Fredericksburg & Potomac Ry. Co.*, 945 F.2d 765, 768 (4th Cir. 1991) (same). In the case of a factual challenge, it is permissible for a district court to "consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg*, 945 F.2d at 768 (citing *Adams*, 697 F.2d at 1219).

## III. Standard of Dismissal for Failure to State a Claim

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. An inference of a mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 679. As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). Although when considering a motion to dismiss a court must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

Additionally, a fraud claim must be pleaded with particularity. Under Federal Rule of Civil Procedure 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud . . . ." However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* The "circumstances constituting fraud" include time, place, and contents of the fraudulent representation, the identity of the person making the misrepresentation, and what that person obtained. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999).

## IV. *Allegations of the Complaint*

Relator Harris worked for DCA for approximately one year as its billing and collection manager; in that role, Harris was responsible for oversight of 45 of DCA's facilities and managed nine departments. (Am. Compl. ¶¶ 5, 6.) Relator Boonie also worked approximately one year for DCA as a billing department supervisor and was responsible for a variety of billing, production planning, payroll, diagnosis coding, and scheduling activities. (*Id.* ¶¶ 8, 9.) DCA owns and operates freestanding kidney hemodialysis centers in Georgia, Maryland, New Jersey, Ohio, Pennsylvania, South Carolina, the District of Columbia, and Virginia, and it also provides in-hospital dialysis services on a contract basis to a number of hospitals located in those same states. (*Id.* ¶¶ 11, 12.)

Relators assert DCA has violated several provisions of the FCA by knowingly presenting to the Government a false or fraudulent claim for payment or approval, by knowingly making a false record or statement to get a false or fraudulent claim paid or approved by the Government, by conspiring to defraud the Government by getting a false or fraudulent claim allowed or paid, and by knowingly making a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, all contrary to 31 U.S.C. § 3729(a)(1),

3

(2), (3), and (7).² (Am. Compl. ¶¶ 23, 69.) Specifically, Relators allege DCA, *a*, altered Social Security numbers on claims (*id.* ¶¶ 25-38); *b*, changed patients' body mass index ("BMI") numbers on claims (*id.* ¶¶ 39-50); *c*, overbilled for Epogen, an anti-anemia drug (*id.* ¶¶ 51-54); *d*, overbilled District of Columbia ("D.C.") Medicaid and Ohio Medicaid (*id.* ¶¶ 55-63); and, *e*, has not made reasonable efforts to collect patients' copayments and coinsurance (*id.* ¶¶ 64-67). In responding to DCA's motion to dismiss, Relators have abandoned the last of these claims. (Pls.' Opp'n 19, ECF No. 69.) Consequently, the Court will address DCA's contentions only as they relate to claims *a* through *d*.

*V. Analysis*

*A. Social Security Numbers*

Relators contend that in 2007 and 2008, DCA used a "QMS" software billing system that did not account for the fact that certain of DCA's patients underwent regular dialysis treatment at one of its facilities and also subsequently travelled to and received treatment at another of its facilities. (*Id.* ¶ 25.) Further, this software billing system was unable to allow billing entries for specific patients after a certain threshold number of "line item" entries had been exceeded. (*Id.* ¶ 26.) Rather than repairing or replacing its billing system to address these inadequacies, DCA, between May 21, 2007, and June 30, 2008, and for several years prior, regularly issued bills to the Government for each of its facilities with altered digits in patients' Social Security numbers. (*Id.* ¶ 27.) Relators contend that this resulted in bills for services that were never rendered to the individuals whose altered Social Security numbers were being used. (*Id.* ¶¶ 29-31.) Additionally, Relators say that Joanne Zimmerman, DCA's vice president and compliance

---

² This section of the United States Code has changed. The subsections of § 3729(a)(1), (2), (3), and (7) referred to in this memorandum now correspond to § 3729(a)(1)(A), (B), (C), and (G), respectively, although with some wording changes. Pub. L. 111-21, May 20, 2009, 123 Stat. 1625.

4

officer, refused to sign a certain report called the "Medicare Credit Balance Report," certifying that DCA was not holding federal monies to which DCA was not entitled. (*Id.* ¶ 34.)

The Court infers from these allegations that the bills submitted with the altered Social Security numbers were for Medicare claims, although this is not entirely clear. DCA argues that the accuracy or inaccuracy of Social Security numbers on Medicare claims is irrelevant because a federal regulation provides that Medicare claims are keyed, not to Social Security numbers, but to separate Medicare identification numbers, which must match Health Insurance Claim Numbers ("HICN"). (Def.'s Mot. Dismiss Supp. Mem. 9, ECF No. 64.) Relators respond that the Court should pay no attention to DCA's argument because the Rule 12(b)(6) analysis only turns on the adequacy of the complaint, not on whether accurate Social Security numbers are material to the Government's decision to approve or disapprove a Medicare claim. (Pls.' Opp'n 8-9, ECF No. 69.)

Relators' argument misses the point of a Rule 12(b)(6) analysis. The Court, it is true, must judge the factual adequacy of a complaint, but it can only do so in reference to governing legal standards. It would be impossible to determine if a complaint's factual allegations allow a plausible inference that a defendant has engaged in misconduct if a court did not consider the elements of applicable causes of action. The governing legal standard in the Fourth Circuit at the time this case was filed required a court to consider whether a false statement was material to the Government's payment approval decision.[3] *See United States ex rel. Berge v. Bd. Trs., Univ. of*

---

[3] Subsequent to the filing of this case, Congress amended the FCA to incorporate a materiality element. This materiality element applies to former 31 U.S.C. § 3729(a)(2), which prohibited one from knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government, and to former § 3729(a)(7), which prohibited one from knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. *See* 31 U.S.C. § 3729(a)(1)(B), (G). Because the Fourth Circuit had likewise incorporated a materiality element into the FCA's prohibitions on false statements prior to this legislative amendment, no appreciable difference in the governing standard is noted for cases arising in this circuit before that time insofar as former § 3729(a)(2) and (7) are concerned.

5

*Ala.*, 104 F.3d 1453, 1459-60 (4th Cir. 1997) (construing former § 3729(a)(2) to include within FCA's scope only false, material statements). Thus, the question arises whether the allegedly inaccurate Social Security numbers were material to the Government's decision whether to pay or approve the claims.

"Materiality" has been defined by the Fourth Circuit in the context of FCA claims as "whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action." *Id.* at 1460 (citation and internal quotation marks omitted).[4] The information on which DCA's argument of nonmateriality is based is the Medicare Claims Processing Manual, Chapter 2 – Admission and Registration Requirements, published by the Centers for Medicare and Medicaid Services ("CMS"),[5] and in particular, section 10 and its subsections, which fortify DCA's argument that Medicare claims are processed under an individual's HICN. Indeed, the manual is explicit about HICNs: "It is important that the patient's HICN be obtained and accurately recorded because the claim cannot be processed if the HICN is missing or incorrect. A social security number is not sufficient." *Id.* section 30. This is consistent with the Code of Federal Regulations relating to Medicare initial determinations, redeterminations, and appeals and the necessity of basing claims on the HICN. *See, e.g.*, 42 C.F.R. § 405.904.

Materiality under the FCA is a mixed question of fact and law to be resolved by the Court. *See Berge*, 104 F.3d at 1460. Relators' allegations do not allow a plausible inference that inaccurate Social Security numbers on any Medicare claims filed by DCA had any natural tendency to influence agency action or were capable of influencing agency action. Thus, the

---

[4] In its 2009 amendments to the FCA, Congress defined "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4).

[5] Found at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c02.pdf (accessed Sept. 30, 2013).

Court cannot infer that DCA made false, material statements to the Government when it allegedly included incorrect Social Security numbers on these claims. Moreover, Relators' own allegations establish that the inaccurate Social Security numbers were utilized on Medicare claims for individuals who had actually received DCA's services. Thus, the underlying claims were not themselves false or fraudulent. This portion of Relators' complaint fails to state a claim for relief.

### B. Body Mass Index Numbers

Relators next allege that DCA violated the FCA by submitting Medicare claims with altered body mass index ("BMI") numbers. They allege that, on average, dialysis patients receive 12 to 13 treatments a month and that, if a patient suffers from heart disease, enlarged heart, liver problems, or certain other medical conditions, then treatments above 12 to 13 a month may be required under federal regulations. (Am. Compl. ¶¶ 39, 40.) However, any claims under these unusual conditions will be permitted only if the claim is manually submitted with a treating physician's written medical authorization and if the claim is documented according to Medicare guidelines. (*Id.* ¶¶ 41-43.) Also, Relators allege that the BMI of a patient must be above a certain threshold for excess dialysis treatments to qualify for Medicare reimbursement. (*Id.* ¶ 44.)

Relators state that on a weekly basis between May 21, 2007, and May 31, 2008, on any dialysis claim rejected for payment because the BMI was not high enough, DCA employees Vicki Murphy, Kim Bowman, and April Johnson, acting under Zimmerman's direction, falsely and retroactively increased the patients' BMIs so that the claims could be approved for payment. (*Id.* ¶ 45.) In addition, the same individuals entered default diagnoses that had never been documented by a physician. (*Id.* ¶ 46.) Relator Harris instructed Murphy, who admitted this activity to him in regular weekly meetings, not to engage in it. (*Id.* ¶ 48.)

Relator Boonie was assigned to open a new facility for DCA in Barnwell, South Carolina, and in that position, oversaw the billing for that facility for three months with no intervention by anyone else. (*Id.* ¶ 49.) During the months of June, July, and August of 2008 when her responsibility for and access to the new facility's billing was exclusive, she sent out "completely legitimate" bills. (*Id.*) But when her access to the facility's billing was no longer exclusive, she personally observed Murphy enter the billing system, increase patient BMIs, and change lab results without medical support in order to obtain payment on rejected claims that had been accurately submitted earlier by Boonie. (*Id.* ¶ 50.)

It is reasonable to infer from these allegations that alteration of BMIs, along with patient diagnoses, resulted in rejected Medicare claims regularly and routinely being approved for payment during the time period May 21, 2007, to May 31, 2008, and especially in the Barnwell, South Carolina, facility in the time period immediately after August 2008. Materiality of the BMI number is supported by reference to 42 C.F.R. § 413.235, which indicates BMI is taken into account by CMS, and published guidance from CMS pertaining to end-stage renal disease payment regulations indicating the same, *see* CMS Rule 1418-F – "Medicare Programs; End-Stage Renal Disease Prospective Payment System."[6] Therefore, the Court concludes this portion of Relators' complaint states a claim for relief under Rules 8(a) and 9(b).

### C. Overbilling for Epogen

DCA argues this portion of Relators' complaint fails under both Rule 12(b)(1) and Rule 12(b)(6). The Court agrees.

The deficiency under Rule 12(b)(1) is premised upon the first-to-file bar contained in the FCA:

---

[6] Found at http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/ESRDpayment/index.html?redirect=/esrdpayment/ (accessed September 30, 2013).

> When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

31 U.S.C. § 3730(b)(5). The Fourth Circuit has described this statutory provision as an "absolute, unambiguous exception-free rule." *United States ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 181 (4th Cir. 2013), *petition for cert. filed*, 82 U.S.L.W. 3010 (Jun. 24, 2013) (No. 12-1497). "[W]hoever wins the race to the courthouse prevails and the other case must be dismissed." *Id.* Any claim that is later filed and is based on the facts underlying the pending case must be dismissed for lack of jurisdiction. *Id.* The Fourth Circuit has adopted the "same material elements test" when considering the applicability of the first-to-file bar, *i.e.*, a later suit is barred if based upon the "same material elements of fraud" as the pending suit, even though the later suit may "incorporate somewhat different details." *Id.* at 182 (citation and internal quotation marks omitted).

Pending at the time of filing of Relators' complaint was another case in this Court, *United States ex rel. Davis v. Dialysis Corporation of America*, Civ. No. CCB-08-2829, which was filed on October 24, 2008. The *Davis* case alleged that DCA directed physicians treating patients under DCA's care to increase orders for Epogen for those patients by 10% and in some instances by more than 16% of the doses the physicians would otherwise order; DCA's direction in this regard was unrelated to medical necessity. (CCB-08-2829, Compl. ¶ 9, ECF No. 1.) Additionally, despite the higher ordered doses, DCA frequently administered less than the full amount of Epogen ordered; however, DCA allegedly billed the Government for the amount ordered in excess of the amount actually administered. (*Id.*)

In the instant case, Relators allege that DCA "fraudulently overbilled the United States government for Epogen dosages by as [*sic*] factor of ten, as evidence [*sic*] by the attached Exhibit '1'" and allege DCA "was also billing the United States government for Epogen

9

administrations that were unverified and did not actually occur"; here, too, Relators refer the Court to another exhibit that they say supports their cause of action. (Am. Compl. ¶¶ 53, 54.)[7] First of all, despite the Court's having perused the two exhibits Relators attached to their complaint, the Court is unable to discern the "smoking gun" in them. To the extent they can be understood by one unfamiliar with the language associated with Medicare billing, they seem to amount to nothing more than discussions of billing errors and efforts to correct the same. But, second, even if this defect were remedied, the Court is left with fairly bare allegations of Epogen overbilling unrelated to actual administration of the drug. This was the focus of the *Davis* suit, and application of the first-to-file bar results in the portion of Relators' case also focused on Epogen overbilling unrelated to actual administration of the drug being dismissed for lack of subject-matter jurisdiction. As noted, in reaching its conclusion that this part of Relators' case must be dismissed on jurisdictional grounds, the Court found the allegations of the complaint woefully inadequate to assert a cause of action. Thus, even if Relators' claim of Epogen overbilling had survived the jurisdictional challenge, it would still fail to state a claim for relief and require dismissal.[8]

### D. D.C. and Ohio Medicaid

The last claim on which Relators rest their complaint alleges in overly general terms that DCA had overbilled D.C. Medicaid and Ohio Medicaid at some unspecified time by two million dollars in D.C. Medicaid's case and three hundred thousand dollars in Ohio Medicaid's case. (Am. Compl. ¶¶ 55, 60.) Relators indicate this occurred because DCA had wrongly billed D.C. Medicaid on a daily basis rather than a monthly basis. (*Id.* ¶ 59.) As for Ohio Medicaid, the

---

[7] The first of these two exhibits is partly unreadable.

[8] The first-to-file bar does not stop a relator from filing a related case once the first case is no longer pending. *Carter*, 710 F.3d at 183. Because the *Davis* case was dismissed on May 30, 2013, Relators conceivably could refile their Epogen claim. However, because their Epogen claim fails as a viable claim otherwise under Rule 12(b)(6), this is a moot point.

overbilling was allegedly based on overbilling for Epogen, already determined by the Court to require dismissal under both Rule 12(b)(1) and Rule 12(b)(6). These allegations do not allow a plausible inference of anything more than billing errors, unaccompanied by the requisite scienter, and further fail under Rule 9(b)'s requirement of particularity in allegations involving fraud. This portion of Relators' complaint must be dismissed for failure to state a claim for relief.

*VI. Conclusion*

The Court concludes that Relators have stated one viable claim for relief concerning alteration of BMI numbers. The rest of the complaint must be dismissed under Rule 12(b)(1), pertaining to the Epogen overbilling claim, and under Rule 12(b)(6), pertaining to all claims other than the alteration of BMI numbers. Relators have made a cursory request for leave to amend their complaint if any of their causes of action are found to be insufficient, but have provided no specific allegations to cure the deficiencies noted by the Court. Leave to amend is hereby denied without prejudice. A separate order will issue.

DATED this 1st day of October, 2013.

BY THE COURT:

/s/
James K. Bredar
United States District Judge